**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| **ANTHONY J. FREITAS,**<br>**in His Individual Capacity and in His Capacity**<br>**as Custodian for the MIDWEST AIRLINES'**<br>**MASTER EXECUTIVE COUNCIL of ALPA,**<br>**as Representative of the Pilots of**<br>**MIDWEST AIRLINES**<br>34 Northwinds Lane<br>West Barnstable, MA 02668-1351 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **KENNETH A. KRUEGER**,<br>**in His Individual Capacity and on Behalf of**<br>**the Pilots of Midwest Airlines**<br>2188 Broadmoor Lane<br>Spring Hill, FL 34606 | )<br>)<br>)<br>)<br>) | Civil Action No. |
| **DONALD TILL,**<br>**in His Individual Capacity and on Behalf of**<br>**the Pilots of Midwest Airlines**<br>S 67 W 24152 Skyline Ave.<br>Waukesha, WI 53189<br><br>*and* | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **AIR LINE PILOTS ASSOCIATION,**<br>**INTERNATIONAL**<br>1625 Massachusetts Ave., N.W., 8th Floor<br>Washington, D.C. 20036<br>*Plaintiffs*, | )<br>)<br>)<br>)<br>)<br>) | |
| *v.* | )<br>) | |
| **REPUBLIC AIRWAYS HOLDINGS, INC.,**<br>**d/b/as a Single Transportation System**<br>**known as "REPUBLIC"**<br>8909 Purdue Road, Suite 300<br>Indianapolis, IN 46268<br><br>*and* | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **MIDWEST AIRLINES, INC.,**<br>8909 Purdue Road, Suite 300<br>Indianapolis, IN 46268<br>*Defendants*. | )<br>)<br>)<br>)<br>) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is a suit on behalf of the pilots of **MIDWEST AIRLINES, INC.** ("Midwest Airlines" or "Midwest"), by three Midwest pilots in their individual and representative capacities, and through the duly designated representative of the Midwest pilots, the **AIR LINE PILOTS ASSOCIATION, INTERNATIONAL** ("ALPA"), to compel defendants **REPUBLIC AIRWAYS HOLDINGS INC.** ("Republic Holdings" or "RAH") and **MIDWEST AIRLINES** to submit pending disputes over the interpretation and application of the Midwest/ALPA collective-bargaining agreement to adjustment pursuant to Section 204 of the Railway Labor Act ("RLA"), 45 U.S.C. § 184. This suit is also to clarify and enforce the right of Midwest pilots to benefits under an employee welfare benefit plan provided by the Midwest/ALPA collective-bargaining agreement.

## PARTIES, JURISDICTION AND VENUE

1.     Captain **ANTHONY J. FREITAS** is an airline pilot who holds seniority as a pilot for Midwest Airlines and was the Chairman of the Master Executive Council for Midwest Airlines, which was the coordinating council established under the ALPA Constitution and By-Laws through which ALPA represented the Midwest pilots. After Midwest Airlines ceased employing pilots holding seniority under the Midwest/ALPA collective-bargaining agreement to fly its operations, Captain Freitas became the ALPA Custodian for the Midwest Master Executive Council. He is also a participant in an employee welfare benefit plan to which defendants Midwest Airlines and RAH are parties. He is bringing this suit both in his individual capacity as a Midwest pilot covered by the grievances at issue, and in his capacity as the ALPA Custodian.

-2-

2. Captain **KENNETH A. KRUEGER** is an airline pilot who holds seniority as a pilot for Midwest Airlines and was adversely affected by defendants' breach of the Midwest/ALPA collective-bargaining agreement. He is also a participant in an employee welfare benefit plan to which defendants Midwest Airlines and RAH are parties. He is bringing this suit both in his individual capacity as a Midwest pilot covered by the grievances at issue, and on behalf of the Midwest pilots whose interests are involved in the grievances.

3. Captain **DONALD TILL** is an airline pilot who holds seniority as a pilot for Midwest Airlines and was adversely affected by defendants' breach of the Midwest/ALPA collective-bargaining agreement. He is also a participant in an employee welfare benefit plan to which defendants Midwest Airlines and RAH are parties. He is bringing this suit both in his individual capacity as a Midwest pilot covered by the grievances at issue, and on behalf of the Midwest pilots whose interests are involved in the grievances.

4. Plaintiff **AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**, is an unincorporated labor organization representing, as relevant here, flight deck crew members on airlines in this Country and Canada, including pilots holding seniority on the Midwest Airlines, Inc., Pilots System Seniority List. ALPA represents Midwest Airlines' flight deck crew members under the RLA, and is a "representative" as that term is defined in RLA § 1 Sixth, 45 U.S.C. § 151 Sixth. ALPA is a party to a collective-bargaining agreement with defendant Midwest dealing with rates of pay, rules, and working conditions governing pilots employed by Midwest, and establishing *inter alia* an employee welfare benefit plan for Midwest pilots and their beneficiaries providing retiree health insurance coverage.

-3-

5.     Defendant **REPUBLIC AIRWAYS HOLDINGS INC.** ("Republic Holdings" or "RAH") is a corporation incorporated under the laws of Delaware. RAH operates as a Single Transportation System for representation purposes under the RLA, which the National Mediation Board has termed "Republic Airlines et al./Frontier," and as such it is a common carrier by air within the meaning of Section 201 of the RLA, 45 U.S.C. § 181, providing scheduled passenger service in the name of Frontier Airlines, Inc. ("Frontier") and under the name of other airlines through Capacity Purchase Agreements. RAH provides airline services in this judicial district.

6.     Defendant **MIDWEST AIRLINES, INC.** is a corporation incorporated under the laws of the State of Wisconsin whose stock is wholly owned by Midwest Air Group, Inc. ("Midwest Air Group" or "MAG"), a Wisconsin corporation. On July 31, 2009, MAG became a wholly-owned subsidiary of defendant RAH. In November 2009, defendant RAH surrendered defendant Midwest Airlines' Federal Aviation Administration Part 121 Operating Certificate, but continued to operate Midwest through its other airline subsidiaries.

7.     Defendant Midwest Airlines, and defendant RAH as Midwest Airlines' successor, remain common carriers by air within the meaning of RLA § 201 and remain parties to collective-bargaining agreements with ALPA establishing rates of pay, rules, and working conditions for pilots flying for Midwest or its successors. Defendants Midwest Airlines and RAH are also employers as that term is defined in Section 3(5) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1002(5). Defendants Midwest Airlines and RAH continue to provide airline services in this judicial district.

8.     This Court has jurisdiction over this complaint by virtue of 28 U.S.C. §§ 1331 and 1337(a), since this suit arises under the RLA, an Act of Congress regulating interstate commerce.

-4-

This court has jurisdiction under ERISA §§ 502(a)(1)(B) and 502(e)(1), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(e)(1), to clarify and enforce plaintiffs' rights under the employee welfare benefit plan established by the Midwest/ALPA collective-bargaining agreement. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over plaintiffs' alternative state-law claim against RAH to enforce RAH's state-law contractual obligations if RAH is not an air carrier subject to the RLA.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), since defendants Midwest and RAH reside in this judicial district.

## FACTUAL BACKGROUND

**A. Applicable Collective-Bargaining Agreement Provisions.**

10. ALPA is the duly-designated and certified representative under the RLA of the class or craft of pilots who hold seniority on defendant Midwest Airlines, and who are entitled to the protections and benefits of the collective-bargaining agreement ALPA has entered into with defendant Midwest Airlines: the Midwest/ALPA collective-bargaining agreement.

11. Section 1.B.1 of the Midwest/ALPA collective-bargaining agreement provides as follows:

> 1. Except as otherwise provided for in this Agreement, all commercial flight operations (whether revenue, non-revenue, scheduled or non-scheduled) conducted by the Company will be flown by pilots whose names appear on the Midwest Airlines, Inc., Pilot System Seniority List.

12. Sections 1.D.2 and 1.D.3 of the Midwest/ALPA collective-bargaining agreement provide:

-5-

2.      Neither the Company nor an affiliate of the Company . . . will conclude any agreement for a Successorship Transaction unless the Successor agrees in writing to assume and be bound by the Agreement, . . . and to employ the pilots on the Midwest Airlines, Inc., Pilot System Seniority List in accordance with the provisions of the Agreement.

3.      The term "Successorship Transaction" shall mean a transfer . . . to the successor of the ownership and/or control of all or substantially all of the equity securities and/or assets of the Company.

        a.      In the event of a Successorship Transaction which results in an operational merger in which the Successor is an air carrier or any person or entity that controls or is under the control of an air carrier, the Successor shall provide the Company's pilots with the seniority integration rights provided in Sections 3 and 13 of the Labor Protective Provisions specified by the Civil Aeronautics Board in the Allegheny-Mohawk merger ("Allegheny-Mohawk LPPs") . . . .

13.      Section 27.B of the Midwest/ALPA collective-bargaining agreement provides in pertinent part that:

B.      Notwithstanding the foregoing, the retiree health insurance coverage (the "retirement coverage") provided under the Midwest Express Airlines, Inc. Medical Plan effective as of September 27, 1995 (including amendments adopted through June 1996) (the "Midwest Express Medical Plan") will remain in effect for pilots, their spouses, dependents, and surviving spouses, for the duration of the Agreement. The cost for retiree medical benefits will be the same terms as is presently or hereafter made available to other crafts and classes of Midwest Airlines, Inc. employees. The Company will, prior to any increase in monthly insurance costs, notify the Association and provide an opportunity to discuss such change prior to the implementation of such change.

14.     Section 21 of the Midwest/ALPA collective-bargaining agreement provides in

pertinent part that:

> A.     In compliance with Section 204, Title 2, of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment for the purpose of handling of disputes growing out of grievances or interpretation of [*sic*] application of this Agreement that have been processed through but not resolved in the procedures as set forth in Section 20 Grievance/Disciplinary Procedure.

> B.     The System Board shall consist of three (3) members, one (1) appointed by the Company, one (1) by the Association, and for each dispute, one (1) member (hereinafter referred to as the neutral member) selected in accordance with Paragraph F of this Section. . . .

> . . .

> F.     Upon the filing of submission with the Company member and the Association member, the Company and the Association shall agree upon the selection of a neutral member to sit with the Board in the consideration and disposition of the case, and if agreement is reached, shall advise the parties of the name and address of the neutral member. If no agreement can be reached within a ten (10) day period, a joint request will be directed to the Chairman of the National Mediation Board for the appointment of seven (7) proposed neutral members. Each side will alternately strike a name until only one remains.

> . . .

> K.     A majority vote of all members of the Board shall be competent to make a decision.

> L.     Decisions of the Board in all cases properly referred to it shall be final and binding upon the parties hereto.

15.     Section 1.G of the Midwest/ALPA collective-bargaining agreement provides:

> The Company agrees to arbitrate any grievance filed by the Association alleging a violation of this Section 1 on an expedited

-7-

basis directly before the System Board of Adjustment sitting with a neutral arbitrator mutually acceptable to both parties. If a mutually agreed upon arbitrator cannot be selected within three (3) days of the filing, an arbitrator will be selected pursuant to Section 21 of this Agreement. The dispute will be heard no later than thirty (30) days following the submission to the System Board (subject to the availability of the arbitrator), and shall be decided no later than thirty (30) days following submission, unless the parties agree otherwise in writing.

**B.    The Airline Services Agreement Between Republic Holdings and Midwest Air Group.**

16.    Prior to September 2008, Midwest employed more than 380 pilots to fly its equipment and routes. During 2008, MAG decided to restructure Midwest and beginning in May 2008, Midwest began to reduce its aircraft fleet, initially grounding all but its 25 leased B-717 aircraft. This resulted in the furloughing of pilots.

17.    In addition to grounding its non-B-717 aircraft, Midwest sought to reduce its fleet of B-717 aircraft by returning four (4) of those planes to the lessor, Boeing Capital Corporation ("Boeing Capital"); it also sought to reduce its monthly rent for the remaining 21 B-717s.

18.    Midwest's fleet restructuring plans changed once Republic Holdings agreed to provide funding to Midwest. On September 3, 2008, MAG and RAH announced that they had entered into a financing agreement by which RAH would provide $25 million to Midwest in two installments. They also announced that, as an integral part of that "pay to play" arrangement, they had entered into an "Airline Services Agreement" under which RAH's subsidiary Republic Airlines, Inc. ("Republic Airlines") agreed to provide twelve (12) Embraer 170 aircraft, to be operated by Republic Airlines pilots, to replace Midwest aircraft and crews on routes Midwest operated.

-8-

Republic Airlines was to provide those airline services under Midwest's brand and livery, using Midwest's "designator code"–*i.e.*, its "YX" airline designation.

19. RAH's participation in Midwest's restructuring modified what Midwest had been seeking in its negotiations with Boeing Capital, for following its decision to have Republic Holdings provide aircraft to fly Midwest's service, Midwest negotiated with Boeing Capital to return an additional 12 B-717s. By September 3, 2008, Midwest and Boeing Capital reached an agreement in principle providing for the return of 16 of the 25 leased B-717s, and that agreement was finalized in a Forbearance Agreement dated October 3, 2008.

20. ALPA informed Midwest that it considered the Airline Services Agreement to violate its collective-bargaining agreement with Midwest, and filed a grievance over that conduct. That grievance was heard by the System Board of Adjustment established under Section 21 of the Midwest/ALPA collective-bargaining agreement and RLA § 204. On January 9, 2009, the adjustment board issued its award denying ALPA's grievance. According to the Board:

> The contested flying has arisen under a formal codeshare agreement between Midwest and Republic. With recognition this particular arrangement includes elements, (including financing and dry lease conversion options) that are unusual, the essential core and character of this arrangement is that of codeshare. The bargained language of the relevant provision [of the Midwest/ALPA collective-bargaining agreement], §1(C)(3) is unequivocal in establishing there are no existing contractual restrictions on such flying. For these reasons the grievance must be denied.

**C. Republic Holdings Acquires Midwest.**

21. In the first quarter of 2009, MAG and RAH entered into discussions for RAH to expand its financial stake in Midwest by acquiring MAG and its subsidiary Midwest. In connection with those negotiations, Midwest negotiated an amendment, dated May 23, 2009, to its Forbearance

-9-

Agreement with Boeing Capital to return the nine (9) B-717s that Midwest had retained under lease from Boeing Capital. During that same time frame, RAH arranged for the acquisition of Embraer 190 aircraft to replace the B-717s, and began the process of amending Republic Airlines' Federal Aviation Administration Operating Certificate to allow Republic Airlines to operate the E-190 aircraft.

22.     Once those arrangements were made to change Midwest's fleet, RAH entered into an Agreement and Plan of Merger with MAG dated June 23, 2009, by which MAG would be merged with RAH's newly-formed, wholly-owned subsidiary, RJET Acquisition, Inc. Under the Agreement and Plan of Merger, MAG survived but as a wholly-owned subsidiary of RAH. Moreover, Article 1, Section 1.4 of the Agreement and Plan of Merger provided that once the merger occurred "all debts, liabilities, obligations and duties of the Merger Sub [*i.e.*, RJET Acquisition, Inc.] and the Company [*i.e.*, MAG] shall become the debts, liabilities, obligations and duties of the Surviving Corporation."

23.     RAH issued a press release on June 23, 2009, announcing its Agreement and Plan of Merger with MAG. In that press release, RAH stated: "Under the agreement, Midwest will become a wholly owned subsidiary of Republic Airways, with the Midwest brand continuing. Midwest Boeing 717s will be replaced with Embraer 190 aircraft, enhancing Midwest's ability to offer nonstop service to key destinations important to its frequent flyers."

24.     RJET Acquisition, Inc. merged with and into MAG on July 31, 2009. RAH continued to provide the Midwest service flying B-717s flown by Midwest crews until the last of those aircraft was returned to Boeing Capital in November 2009, and Embraer aircraft (E-170s and E-135/145s) under the Airline Services Agreement, flown by Republic Airlines crews. In August 2009, RAH

began to use E-190 aircraft piloted by Republic Airlines pilots under the amended Airline Services Agreement to replace the B-717s being returned to Boeing Capital.

**D.      ALPA Files A Grievance In July 2009 To Challenge Midwest's And RAH's Actions Replacing Midwest Pilots And Ignoring The Midwest/ALPA Collective-Bargaining Agreement.**

25.      On July 30, 2009 (the day before it acquired Midwest), RAH announced to investors that it intended to transition Midwest into Republic by January 2010. It stated that the transition would be driven by a fleet conversion by which it would replace the nine B-717s with "roughly nine to ten E-190s." RAH further stated that if it were able to "end up with a fleet plan that's based on operating 190s and 195s out of Milwaukee, those aircraft will operate on the Republic [Airlines] certificate and there will not be a need for a Midwest operating certificate."

26.      ALPA filed a grievance on July 31, 2009, in response to the replacement of the B-717s with the E-190s, asserting that Midwest's actions violated the scope clause of the Midwest/ALPA collective-bargaining agreement. ALPA subsequently amended that grievance to assert that Midwest's action also violated the requirement in Section 1.D of the Agreement, which requires that, in the event an airline holding company, such as RAH, acquires control over Midwest, and engages in an operational merger, the successor must operate the two airlines separately–*i.e.*, "fence" their separate operations–until the seniority of their separate pilot groups could be integrated pursuant to the terms of the collective-bargaining agreements. Midwest defended against the grievance by asserting that the January 9, 2009 System Board Award controlled and that the use of the E-190's flown by Republic Airlines' pilots was a permissible code-share arrangement. It also asserted that since Boeing Capital had recalled the remaining B-717s, Midwest had no planes to "fence."

-11-

27.     That grievance was heard by the ALPA/Midwest System Board on an expedited basis on September 23, 2009. After opening arguments, but before any testimony had been taken, the System Board, through its chairperson Richard I. Bloch, issued an award stating:

> Pilots actively employed as of June 23, 2009 (including those on FMLA leave, et cetera) but who were subsequently furloughed, shall be deemed, as an alternative to furlough, to occupy the position they held on June 23, 2009, without any rights to pay or benefits, pending the final outcome of the RAH Seniority Integration Process;

> Pilots actively employed as of September 23, 2009 shall remain in active status until such time as MEA's [*i.e.*, Midwest's] remaining B-717 aircraft are grounded. As of that date, as an alternative to furlough, all such pilots shall be deemed to continue to occupy the position they held on September 23, 2009, without any rights to pay or benefits pending the final outcome of the RAH Seniority Integration Process.

**E.     RAH Acquires Frontier Airlines And Transforms Midwest Into A "Virtual Airline" Flown By Republic Airlines And Frontier Pilots.**

28.     On October 1, 2009, RAH expanded its entry into branded airline operations by acquiring Frontier's holding company and its subsidiaries Frontier Airlines and Lynx Aviation, Inc., ("Lynx") as they emerged from reorganization under Chapter 11 of the Bankruptcy Code, with RAH as the sponsor of the Plan of Reorganization. Both prior to and since it acquired Frontier, RAH used Frontier equipment and pilots to fly Midwest service.

29.     Midwest returned the last of its B-717s to Boeing Capital in November 2009, and then surrendered its Federal Aviation Administration Part 121 Operating Certificate. As the National Mediation Board recently found, Midwest also "returned its designator code to the Department of Transportation. The designator code was reissued to RA [Republic Airlines], allowing RA to operate

-12-

as RA d/b/a Midwest . . . ." *In re Pilots of Republic Airlines, et al.*, 38 NMB 138, 145 (April 7, 2011).

30. Initially, RAH operated Midwest and Frontier as separate but interrelated brands, with each brand flying under its own name. But on April 13, 2010, RAH announced that it had decided to integrate the Midwest brand into the Frontier brand, with Frontier as the surviving brand. That operational integration is continuing. As the National Mediation Board further found: "Following the decision to discontinue the Midwest brand, RAH is retaining the 'YX' designator code but ceasing the use of the 'd/b/a Midwest' designation." *In re Pilots of Republic Airlines, et al.*, 38 NMB at 146.

F.      **Seniority Integration And Single-Carrier Proceedings.**

31. On November 3, 2009, RAH, on behalf of itself and its six airline operating subsidiaries (Chautauqua Airlines, Inc., Shuttle America Corp., Republic Airlines, Midwest, Frontier and Lynx), entered into a Dispute Resolution Agreement (DRA) with the pilots of those six airline subsidiaries, who are represented for collective bargaining purposes by four labor organizations, to negotiate the integration of the pilots' seniority under Section 3 of the *Allegheny-Mohawk* Labor Protective Provisions (LPPs), and to arbitrate that integration if negotiations and mediation proved unsuccessful. Those negotiations proved unsuccessful and on March 15, 2010, the parties began to present their cases to an arbitrator selected pursuant to that DRA under Section 13(b) of the *Allegheny-Mohawk* LPPs.

32. While the seniority integration proceeding was ongoing, the International Brotherhood of Teamsters ("Teamsters"), which is the duly-designated representative of the pilots employed by Chautauqua Airlines, Shuttle America, and Republic Airlines, filed an application with

-13-

the National Mediation Board on October 4, 2010, pursuant to RLA § 2 Ninth, 45 U.S.C. § 152 Ninth, alleging that RAH's airline operating subsidiaries (including Frontier but *not* Midwest) constituted a single transportation system for purposes of the RLA and that a dispute existed among the pilots of that single transportation system as to which labor organization represented them.

33.     ALPA responded to the Teamsters' application by asserting that the single transportation system includes all of the RAH carriers, including Midwest, while the representative of the Frontier pilots asserted that Frontier is not a part of that system.

34.     On February 19, 2011, the arbitrator hearing the seniority integration dispute, issued his award integrating the seniority of the four pilot groups. The integrated list is to be effective no later than 60 days after the National Mediation Board certifies the bargaining representative for the craft or class of pilots of the single transportation system.

35.     On April 7, 2011, the National Mediation Board issued its determination that "RA [*i.e.*, Republic Airlines], Shuttle, Chautauqua, Frontier and Lynx are operating as a single transportation system (Republic Airlines et al./Frontier) for the craft or class of Pilots, and further, that Midwest Pilots are included in the single transportation system." *In re Pilots of Republic Airlines, et al.*, 38 NMB at 138-39. A true and accurate copy of that determination is attached hereto as ALPA Ex. 1. The Board then noted that it would proceed to determine which organization represented the single transportation system's craft or class of pilots, giving any intervener fourteen (14) days in which to establish that it had the support from at least 35% of the craft or class. *Id*., 38 NMB at 157. The Board "reminded" the participants that "existing certifications remain in effect until the Board issues a new certification or dismissal." *Id*.

-14-

### G. ALPA Files Grievances Over RAH's Transforming Midwest Into A "Virtual Airline."

36.     Once Republic Airlines ceased operating Midwest flights on a code sharing basis and instead began to operate those flights as Midwest Airlines, ALPA filed another grievance on November 23, 2009, a true and accurate copy of which is attached hereto as ALPA Ex. 2. That new grievance referred to Section 1.B.1 of the Midwest/ALPA collective-bargaining agreement, which requires that "all commercial flight operations . . . conducted by the Company will be flown by [Midwest/ALPA] pilots . . . ," and asserted that:

> The Company's decision to discontinue its own flying and transfer former Midwest flying to Republic Airlines and Frontier Airlines, which conduct such flying as a d/b/a Midwest operation performed solely under those carriers' respective certificates, and not pursuant to a codeshare with now-idled Midwest, constitutes a violation of Section 1.B.1. in that commercial flight operations conducted by the Company will be operated by pilots other than those on the Midwest Airlines, Inc., Pilot System Seniority List. This action also violates Section 1.C.1. [of the collective-bargaining agreement, which permits subcontracting of flying under certain conditions] in that the Company has failed to satisfy all requisite elements for subcontracting to occur.

37.     That grievance was held in abeyance while a comparable grievance by the Midwest flight attendants was heard. On March 15, 2011, the Midwest Flight Attendants System Board issued its award, which is attached hereto as ALPA Ex. 3, concluding that Midwest violated the "successor clause" in the Midwest/Flight Attendant collective-bargaining agreement (which is similar to the successor clause in the Midwest/ALPA collective-bargaining agreement) "when transferring substantially all of its non-flight assets without requiring Republic Airlines to assume the [Midwest/Flight Attendant] Agreement." ALPA Ex. 3 at 9.

-15-

38.     While the Midwest Flight Attendant grievance was pending before the Midwest Flight Attendant System Board, ALPA concluded that its November 23, 2009 grievance should be reactivated; it reactivated that grievance by serving on December 30, 2010, an amended grievance on RAH and Midwest to supplement the grievance filed on November 23, 2009. A true and accurate copy of the December 30, 2010 amended grievance is attached hereto as ALPA Ex. 4.

39.     As supplemented and amended, the grievance raises three claims (ALPA Ex. 4 at 2-3):

> First, Midwest's and RAH's decision to operate on or after November 3, 2009, as a "virtual airline" through its subsidiary Republic Airlines, Inc. d/b/a Midwest Airlines, and then to integrate its Midwest operations with the operations of its other subsidiary, Frontier Airlines, deprived the pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List of their contractual rights under the Agreement to perform all flying by Midwest and RAH. That violation, as alleged in the November 23, 2009 Grievance began on November 3, 2009, and is a continuing contract violation. In addition to depriving Midwest pilots of employment, this violation has furthered injured them in that it has deprived them of placement on the integrated seniority list, which is currently being devised, where their equities would have placed them if RAH had honored its obligations under the Agreement and continued to use pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List to perform Midwest flying.
>
> Second, the Agreement is binding on RAH as the successor to Midwest under Section 1.D.1 of the Agreement, and, thus, pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List are entitled to the benefits provided by that Agreement whenever performing any service for RAH or any of its operating subsidiaries. At present, RAH and representatives of the RAH pilots are devising an integrated seniority list. Once that list is effective, it will entitle pilots holding seniority on it to positions in the integrated operations and elsewhere within the RAH system. At the same time, Midwest pilots are entitled to the benefits of the Association/Midwest Agreement when performing services for RAH. RAH, however, has taken the position that the Association/Midwest Agreement is no

-16-

longer of any force and effect. This position has deprived, and continues to deprive, Midwest pilots of the benefits to which they are entitled under the Agreement.

Third, there are certain aspects of the Agreement that create vested rights in the Midwest pilots, such as longevity and recall, which are binding on RAH as the successor to Midwest Airlines. RAH is denying the Midwest pilots it hired between November 3, 2009 and today of those vested rights, first by not recalling them in seniority order and second by treating those who have been hired as new-hires without any credit for their service as Midwest pilots for pay and benefit purposes. That violation is continuing.

40.     ALPA requested the following relief (ALPA Ex. 4 at 3-4):

In addition to the remedies requested by the November 23, 2009 grievance, which the Association reiterates herein, the Association seeks the following remedies in connection with this grievance as supplemented: (1) an Award declaring that RAH is the successor to Midwest and that the Agreement is binding on RAH and its subsidiaries; (2) an Award directing Midwest and RAH to make whole all Midwest pilots who have not been employed to fly the Midwest brand (and since April 13, 2010, the Midwest brand and the Midwest portion of the integrated Frontier brand); (3) an Award directing RAH to make whole the Midwest pilots it has hired as new employees since November 3, 2009, for the pay and benefits they should have received had RAH credited them with their longevity as Midwest pilots for pay and benefit purposes; and (4) such further action as may be deemed just and equitable, including a pay supplement to all Midwest pilots (recalled and furloughed) who have been deprived of their proper place on the integrated seniority list due to Midwest's and RAH's violation of the Agreement.

41.     By a letter dated February 8, 2011, RAH responded to the supplemented and amended grievance; a true and accurate copy of that response is attached hereto as ALPA Ex. 5. RAH asserted that "[a]ll of the issues raised in the Amended Grievance have already been adjudicated and resolved by the" September 23, 2009 award by Arbitrator Bloch. ALPA Ex. 5 at 1. RAH further asserted that the November 23, 2009 and December 30, 2010 grievances "raise a representation dispute that is not

-17-

subject to arbitration." ALPA Ex. 5 at 3. The letter then concluded: "For these reasons, RAH need not–and will not–arbitrate either the Amended Grievance or the November 2009 Grievance. Both are foreclosed by the Decision [*i.e.*, the September 23, 2009 Bloch Award], and both raise a representation dispute that is already pending before the NMB and is within the NMB's exclusive jurisdiction." *Id.*

**H.      ALPA Files A Grievance Over RAH/Midwest' Plans To Discontinue The Retirement Coverage For Retired Midwest Pilots And Their Spouses and Dependants.**

42.      On December 20, 2010, RAH/Midwest advised ALPA that it would discontinue in early 2011 the retiree health insurance coverage that retired Midwest pilots, their spouses and dependents were receiving pursuant to Section 27.B of the Midwest/ALPA collective-bargaining agreement ("Retirement Coverage"). On December 30, 2010, ALPA filed a grievance with RAH/Midwest asserting that RAH/Midwest's discontinuance of the Retirement Coverage would violate Section 27.B and informing the company that it would seek an award "(1) . . . declaring that Section 27.B of the Agreement continues to bind Midwest Airlines, and RAH as Midwest's successor; (2) that such retired pilots and their spouses be made whole for any costs associated with this grievance; and (3) such further action as may be deemed just and equitable." A true and accurate copy of that grievance is attached hereto as ALPA Ex. 6.

43.      Neither RAH nor Midwest Airlines responded to that grievance, but, effective April 1, 2011, RAH discontinued the Retirement Coverage. A true and accurate copy of the letter dated February 1, 2011, that RAH used to inform retired Midwest pilots of the discontinuance of their Retirement Coverage is attached hereto as ALPA Ex. 7.

-18-

44.     Midwest Pilots have a right under RLA § 204 to submit to the Midwest/ALPA System Board of Adjustment for final and binding resolution any dispute arising out of the interpretation or application of the Midwest/ALPA Agreement, including the November 23, 2009 grievance, the December 30, 2010 amended supplemented grievance, and the December 30, 2010 Retirement Coverage grievance. RAH and Midwest have a corresponding, judicially enforceable duty under RLA §§ 2 First and 204 to exert every reasonable effort to resolve the November 23, 2009 and two December 30, 2010 grievances, including by participating in the resolution of those disputes through the Midwest/ALPA System Board of Adjustment. This suit is to enforce plaintiffs' rights and defendants' obligations. This suit is also to enforce the Midwest/ALPA collective-bargaining agreement, with its employee welfare benefit plan, as construed by the Midwest/ALPA System Board of Adjustment.

## COUNT I (RLA VIOLATIONS)

45.     Plaintiffs incorporate and reiterate the allegations set forth in Paragraphs 1 through and including 44 of this Complaint.

46.     Section 2 First of the RLA, 45 U.S.C. § 152 First, provides that:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

47.     Section 204 of the RLA, 45 U.S.C. § 184 (emphasis added), provides in pertinent part that:

-19-

The *disputes between an employee or group of employees and a carrier or carriers* by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board, as hereinafter provided, with a full statement of the facts and supporting data bearing upon the disputes.

It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of this title, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 3, title I, of this Act [45 U.S.C. § 153].

Such boards of adjustment may be established by agreement between employees and carriers either on any individual carrier, or system, or group of carriers by air and any class or classes of its or their employees . . . .

48.     The November 23, 2009 grievance, the December 30, 2010 amended supplemented grievance, and the December 30, 2010 Retirement Coverage grievance (to the extent RAH/Midwest may dispute the plain meaning of Section 27.B of the Midwest/ALPA collective-bargaining agreement), raise minor disputes under the RLA over which defendants Midwest and RAH must confer with the Midwest pilots and must use every reasonable effort to resolve, including presenting those grievances to the Midwest/ALPA System Board of Adjustment for final and binding resolution.

49.     Defendants RAH's and Midwest's claim that the November 23, 2009 and December 30, 2010 amended and supplemented grievances are barred by earlier System Board of Adjustment

-20-

decisions raises an issue of contract interpretation or application that is itself subject to the exclusive jurisdiction of the Midwest/ALPA System Board of Adjustment.

50.     Until the National Mediation Board rules otherwise, ALPA remains the duly designated representative of Midwest pilots and defendants RAH and Midwest must treat with ALPA over any disputes arising with respect to agreements concerning rates of pay, rules, and working conditions of Midwest pilots, including what provisions in the Midwest/ALPA collective-bargaining agreement continue to protect Midwest pilots.

51.     The Midwest/ALPA collective-bargaining agreement is binding upon the parties to that Agreement and upon any successor collective-bargaining agent for the Midwest pilots, and continues in effect unless and until that Agreement is changed pursuant to RLA § 6, 45 U.S.C. § 156.

52.     RAH's and Midwest's duties to exert every reasonable effort to resolve the November 23, 2009 and the two December 30, 2010 grievances, including by participating in the adjustment of those disputes before the Midwest/ALPA System Board of Adjustment, run to the Midwest pilots and will continue even if the National Mediation Board should certify a representative other than ALPA craft or class of pilots on the single transportation system it found existed on April 7, 2011.

53.     By refusing to participate in the adjustment of the November 23, 2009 and December 30, 2010 grievances before the Midwest/ALPA System Board of Adjustment Board, defendants RAH and Midwest are violating their duties under RLA §§ 2 First and 204 to exert every reasonable effort, including their obligation to participate in the RLA § 204 Adjustment Board process, to resolve disputes arising out of the interpretation or application of the Midwest/ALPA collective-bargaining agreement.

## COUNT II (ERISA AND RLA VIOLATIONS)

54.     Plaintiffs incorporate and reiterate herein the allegations set forth in Paragraphs 1 through and including 44 of this Complaint.

55.     Section 2 Seventh of the RLA, 45 U.S.C. § 152 Seventh, provides that:

> No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act.

56.     Defendant Midwest Airlines, and defendant RAH as the successor to Midwest under the Midwest/ALPA collective-bargaining agreement, are obligated to comply with Section 27.B of the Midwest/ALPA collective-bargaining agreement by providing Retirement Coverage benefits to retired Midwest pilots, their spouses and dependents until that obligation is changed in accordance with the major dispute procedures of the RLA.

57.     By unilaterally discontinuing an employee welfare benefit plan (namely, the Retirement Coverage to retired Midwest pilots, their spouses and their dependents) protected by both RLA § 2 Seventh and ERISA, defendants RAH and Midwest Airlines have breached their obligations under both RLA § 2 Seventh and ERISA.

## COUNT III (STATE LAW CLAIM)

58.     RAH, as the successor to Midwest, is bound to the terms and provisions of the Midwest/ALPA collective-bargaining agreement, and, if RAH is not a carrier subject to the RLA, it is bound by Section 1.G of the Midwest/ALPA collective-bargaining agreement and by the common law of contracts to adjust any dispute arising from its obligations as a successor pursuant to the procedures established by Section 21 of that Agreement.

-22-

59. By refusing to participate in the proceedings before the Midwest/ALPA System Board of Adjustment Board to resolve the November 23, 2009 and the two December 30, 2010 grievances, defendant RAH is violating its contractual obligations to arbitrate those disputes, including any defenses it may raise to the merits of those claims.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant them and the Midwest pilots the following relief:

A. Issue a declaratory judgment declaring that Midwest and RAH are required by Sections 2 First and 204 of the RLA to exert every reasonable effort to resolve the disputes arising from the interpretation and application of the Midwest/ALPA collective-bargaining agreement raised by ALPA in its November 23, 2009 Grievance, as amended by the December 30, 2010 Grievance, and in its December 30, 2010 Retirement Coverage grievance, including participating in the resolution of those disputes before the Midwest/ALPA System Board of Adjustment;

B. Issue a mandatory injunction requiring defendants Midwest and RAH to exert every reasonable effort to resolve the disputes arising from the interpretation and application of the Midwest/ALPA collective-bargaining agreement raised by ALPA in its November 23, 2009 Grievance, as amended by the December 30, 2010 Grievance, and in its December 30, 2010 Retirement Coverage grievance, and to participate in the resolution of those disputes by the Midwest/ALPA System Board of Adjustment;

C. Reserve jurisdiction to enforce RLA § 2 Seventh once the Midwest/ALPA System Board of Adjustment resolves disputes over the interpretation of the Midwest/ALPA collective-bargaining agreement, to make whole all Midwest pilots who have been injured by RAH's and

-23-

Midwest's violation of RLA § 2 Seventh, including making whole all retired Midwest pilots and their spouses and dependents who have been injured by RAH's and Midwest's unilateral discontinuance of the Retirement Coverage; and

D.      Grant such other and further relief as this Court deems to be just and proper, including requiring defendants to reimburse plaintiffs for their costs and attorneys' fees in bringing this suit under the RLA, and under ERISA § 502(a)(1)(B) as provided by ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

Respectfully Submitted,

_____
John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
1050 17th Street, N.W., Suite 444
Washington, D.C. 20036
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

_____
Marcus Migliore
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
1625 Massachusetts Ave., N.W., 8th Floor
Washington, D.C. 20036
Phone: (202) 797-4064
Email: marcus.migliore@alpa.org

Date: April 14, 2011                    Attorneys for Plaintiffs

-24-