# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANTHONY J. FREITAS,
KENNETH A. KRUEGER,
DONALD TILL, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

                Plaintiffs,

     -vs-                                             Case No. 11-C-358

REPUBLIC AIRWAYS HOLDINGS, Inc., and
MIDWEST AIRLINES, Inc.,

                Defendants.

# DECISION AND ORDER

The plaintiffs, former Midwest airline pilots and their certified representatives under the Railway Labor Act ("RLA"), bring this action to compel Republic Airways Holdings, Inc. ("RAH") and Midwest Airlines, Inc. ("Midwest") to participate in grievance resolution proceedings before the Midwest-Air Line Pilots Association ("ALPA") System Adjustment Board. Plaintiffs move for summary judgment. For the reasons that follow, this motion is granted with respect to Midwest, but denied with respect to RAH.

## I. BACKGROUND

RAH is an airline holding company incorporated in Delaware. In July 2009, RAH acquired Midwest, and Midwest became a wholly owned subsidiary of RAH.[1] RAH also

---

[1] For more background on this transaction, see *Committee of Concerned Midwest Flight Attendants v. Int'l Bhd. of Teamsters*, 742 F. Supp. 2d 1035 (E.D. Wis. 2010).

owns Chautauqua Airlines, Inc., Shuttle America Corporation ("Shuttle"), Republic Airline Inc. ("RA"), and Frontier Airlines, Inc. ("Frontier"). Anthony Frietas, Kenneth Krueger and Donald Till were actively employed as Midwest pilots until Midwest stopped flying routes in November of 2009.

For a relatively brief period of time after Midwest was acquired by RAH, Midwest continued to operate as a separate air carrier, providing air transportation services under its own DOT and FAA operating certificates with its Boeing 717 aircraft fleet. The B-717s were operated by the Midwest pilots pursuant to the Midwest-ALPA CBA. However, on November 3, 2009, Midwest returned the last of its B-717 aircraft and laid-off its remaining pilots. Midwest provided no transportation services and employed no active pilots since this date. By November 13, 2009, the last of the B-717s were returned to Boeing, and Midwest no longer had any aircraft on its DOT and FAA operating certificates. After Midwest ceased operations, RA d/b/a Midwest Airlines continued to operate flights under the Midwest brand and "YX" code using RA E-170 and E-190 aircraft and RA crews. The Midwest brand was discontinued effective October 1, 2010.

Some of the former Midwest pilots were offered employment at Chautauqua, RA, Shuttle and Frontier. The pilots that accepted offers of employment are considered employees of the applicable carrier. Approximately 37 former Midwest pilots are employed at one of the RAH subsidiary carriers. Except for several pilots who retired or resigned since Midwest ceased operations, the rest of the former Midwest pilots remain on furlough status and are not actively employed by any RAH-affiliated carrier. The total number of Midwest

pilots on furlough is 344. *In the Matter of Int'l Bhd. of Teamsters, Airline Div.*, 38 NMB 138, 147 (2011); D. 1-1.

At the time of the acquisition, Midwest pilots were represented by ALPA and covered by a collective bargaining agreement between Midwest and ALPA. On April 7, 2011, the National Mediation Board found that "Chautauqua, Shuttle, RA, Frontier, and Lynx are operating as a single transportation system (Republic Airlines et al./Frontier) for the craft or class of Pilots for representation purposes under the RLA" and that the "former Midwest Pilots are included in the single transportation system." 38 NMB 138, 157. On June 28, 2011, the NMB certified the International Brotherhood of Teamsters ("IBT") as "duly designated and authorized to represent for the purposes of the RLA, as amended, the craft of class of Pilots, employees of Republic Airlines et al./Frontier, its successors and assigns." *In the Matter of the Representation of Employees of Republic Airlines, et al./Frontier Pilots*, 38 NMB 245, 246 (2011); D. 20-1. Upon being certified, the IBT intervened and replaced ALPA as co-plaintiffs in this lawsuit.

The grievances at issue involve the following provisions of the collective bargaining agreement between ALPA and Midwest. Section 1.B.1 (the "scope" clause) provides, with certain exceptions, that "all commercial flight operations (whether revenue, non-revenue, scheduled or non-scheduled) conducted by the Company will be flown by pilots whose names appear on the Midwest Airlines, Inc., Pilot Seniority List." Section 1.D.1 through 1.D.3 (the "successorship" clause(s)) provides as follows:

> 1. This Agreement shall be binding on any successor, including but not limited to any merged company or companies, purchaser,

-3-

>  assign, assignee, transferee, receiver, administrator, executor, and/or trustee of the Company, if any.
>
>  2. Neither the Company nor an affiliate of the Company . . . will conclude any agreement for a Successorship Transaction unless the Successor agrees in writing to assume and be bound by the Agreement, . . . and to employ the pilots on the Midwest Airlines, Inc., Pilot System Seniority List in accordance with the provisions of the Agreement.
>
>  3. The term "Successorship Transaction" shall mean a transfer . . . to the successor of the ownership and/or control of all or substantially all of the equity securities and/or assets of the Company.
>
>> a. In the event of a Successorship Transaction which results in an operational merger in which the Successor is an air carrier or any person or entity that controls or is under the control of an air carrier, the Successor shall provide the Company's pilots with the seniority integration rights provided in Sections 3 and 13 of the Labor Protective Provisions specified by the Civil Aeronautics Board in the Allegheny-Mohawk merger ("Allegheny-Mohawk LPPs") . . .

Finally, Section 27.B (the "Retirement Coverage" clause) provides that retiree health insurance coverage "will remain in effect for pilots, their spouses, dependents, and surviving spouses, for the duration of the Agreement. The cost for retiree medical benefits will be the same terms as is presently or hereafter made available to other crafts and classes of Midwest Airlines, Inc. employees. The Company will, prior to any increase in monthly insurance costs, notify the Association and provide an opportunity to discuss such change prior to the implementation of such change."

On November 23, 2009, ALPA filed a grievance (the "scope" grievance) with Midwest alleging as follows:

> The Company's decision to discontinue its own flying and transfer former Midwest flying to Republic Airlines and Frontier Airlines, which conduct such flying as a d/b/a Midwest operation performed solely under those carriers' respective certificates, and not pursuant to a codeshare with now-idled Midwest, constitutes a violation of Section 1.B.1. [of the Midwest/ALPA collective bargaining agreement] in that commercial flight operations conducted by the Company will be operated by pilots other than those on the Midwest Airlines, Inc., Pilot System Seniority List. This action also violates Section 1.C.1. [of the collective-bargaining agreement, which permits subcontracting of flying under certain conditions] in that the Company has failed to satisfy all requisite elements for subcontracting to occur.

On December 30, 2010, ALPA expanded its grievance by serving both Midwest and RAH with an amended and supplemental grievance (the "amended scope & successorship" grievance). This grievance raised three claims:

> First, Midwest's and RAH's decision to operate on or after November 3, 2009, as a 'virtual airline' through its subsidiary Republic Airlines, Inc. d/b/a Midwest Airlines, and then to integrate its Midwest operations with the operations of its other subsidiary, Frontier Airlines, deprived the pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List of their contractual rights under the Agreement to perform all flying by Midwest and RAH. That violation, as alleged in the November 23, 2009 Grievance began on November 3, 2009, and is a continuing contract violation. In addition to depriving Midwest pilots of employment, this violation has further[] injured them in that it has deprived them of placement on the integrated seniority list, which is currently being devised, where their equities would have placed them if RAH had honored its obligations under the Agreement and continued to use pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List to perform Midwest flying.
>
> Second, the Agreement is binding on RAH as the successor to Midwest under Section 1.D.1 of the Agreement, and, thus, pilots holding seniority on the Midwest Airlines, Inc., Pilot System Seniority List are entitled to the benefits provided by that Agreement whenever performing any service for RAH or any of its operating subsidiaries. At present, RAH and representatives of the RAH pilots are devising an integrated seniority list. Once that list is effective, it will entitle pilots holding seniority on it to positions in the integrated

> operations and elsewhere within the RAH system. At the same time, Midwest pilots are entitled to the benefits of the Association/Midwest Agreement when performing services for RAH. RAH, however, has taken the position that the Association/Midwest Agreement is no longer of any force and effect. This position has deprived, and continues to deprive, Midwest pilots of the benefits to which they are entitled under the Agreement.
>
> Third, there are certain aspects of the Agreement that create vested rights in the Midwest pilots, such as longevity and recall, which are binding on RAH as the successor to Midwest Airlines. RAH is denying the Midwest pilots it hired between November 3, 2009 and today of those vested rights, first by not recalling them in seniority order and second by treating those who have been hired as new-hires without any credit for their service as Midwest pilots for pay and benefit purposes. That violation is continuing.

In addition to the relief requested in the November 23 scope grievance, ALPA requested the following relief in the amended scope & successorship grievance: (1) an Award declaring that RAH is the successor to Midwest and that the Agreement is binding on RAH and its subsidiaries; (2) an Award directing Midwest and RAH to make whole all Midwest pilots who have not been employed to fly the Midwest brand; (3) an Award directing RAH to make whole the Midwest pilots it has hired as new employees since November 3, 2009, for the pay and benefits they should have received had RAH credited them with their longevity as Midwest pilots for pay and benefit purposes; and (4) such further action as may be deemed just and equitable, including a pay supplement to all Midwest pilots (recalled and furloughed) who have been deprived of their proper place on the integrated seniority list due to Midwest's and RAH's violation of the Agreement.

Finally, on December 30, 2010, ALPA served a grievance challenging the decision to discontinue certain health insurance coverage provided to retired Midwest pilots, their

-6-

spouses and their dependents pursuant to Section 27.B (the "Retirement Coverage" grievance).

## II. ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). Summary judgment motions brought at the outset of litigation are expressly allowed under the federal rules. "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

### A. Motion to compel RAH to arbitrate

Section 204 of the Railway Labor Act directs the establishment of a "board of adjustment" for the resolution of "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or

-7-

Case 2:11-cv-00358-RTR   Filed 11/10/11   Page 7 of 16   Document 33

application of agreements concerning rates of pay, rules, or working conditions . . ." 45 U.S.C. § 184. Plaintiffs move to compel Midwest and RAH to adjust their grievances before the adjustment board established pursuant to the Midwest/ALPA collective bargaining agreement. Midwest is a party to that agreement; RAH is not.

In their attempt to compel RAH to arbitrate under the Midwest/ALPA CBA, plaintiffs rest on the Supreme Court's holding in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964). In *John Wiley*, the Court held that the "disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement . . . in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." 376 U.S. at 548. The holding in *Wiley* is not as expansive as the plaintiffs would suggest. The vast majority of cases find that an "unconsenting successor employer cannot be bound by the substantive terms of an existing CBA." *AmeriSteel Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 275 (3d Cir. 2001) (collecting cases); *but see Local 348-S v. Meridian Mgmt. Corp.*, 583 F.3d 65, 68 (2d Cir. 2009) (successor must arbitrate under *Wiley*); *also see, Successor Employer's Obligations Under a Preexisting Collective Bargaining Agreement: The Second Circuit Misinterprets Supreme Court Decisions and Sets a Harmful Precedent*, 76 J. Air L. & Com. 143 (Winter 2011) (criticizing Second Circuit's ruling in *Meridian*).[2]

---

[2] Neither party suggests that RAH is an "alter ego" of Midwest, or that RAH "voluntarily assumed the obligations of its predecessor's CBA." *Southward v. S. Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 493 (6th Cir. 1993).

-8-

*Wiley*, alongside *NLRB v. Burns Int'l Servs., Inc.*, 406 U.S. 272 (1972) and *Howard Johnson Co. v. Hotel and Rest. Empl.*, 417 U.S. 249 (1974), is part of a "troubled trilogy" of Supreme Court jurisprudence concerning the labor law successorship doctrine. *AmeriSteel*, 267 F.3d at 268. In *Wiley*, the predecessor employer merged with the successor and ceased doing business as a separate entity. The holding of *Wiley* is "actually quite limited." *AmeriSteel* at 268. "We do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives." *Wiley* at 551. Instead, "there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." *Id.*

In *Burns*, the Court rejected a union's unfair labor practice charge against a successor to a security services contract who retained most of the employees that worked for the predecessor. The Court observed that *Wiley* "suggests no open-ended obligation" that a successor be "held bound by the contract executed" by the predecessor. 406 U.S. at 286. Instead, *Wiley*'s "narrower holding dealt with a merger occurring against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation." *Id.* In *Burns*, there was "no merger or sale of assets, and there were no dealings whatsoever" between the successor and the predecessor. *Id.* The balance of power between employers and labor should be "set by

-9-

economic power realities. Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties." *Id.* at 288.

In *Howard Johnson*, the Court acknowledged the tension between its rulings in *Wiley* and *Burns*. Instead of resolving this tension, the Court distinguished *Wiley*. "*Wiley* involved a merger, as a result of which the initial employing entity completely disappeared. In contrast, this case involves only a sale of some assets, and the initial employers remain in existence as viable corporate entities." 417 U.S. at 257. Thus, as noted by *Burns*, requiring Wiley to arbitrate under its predecessor's CBA "may have been fairly within the reasonable expectations of the parties." *Id.* Also, the disappearance of the original entity in *Wiley* meant that the union was without a remedy, but in *Howard Johnson*, the predecessor still existed as a viable entity. *Id.* at 257-58. Finally, in *Wiley*, all of the original employees were absorbed by the successor, but in *Howard Johnson*, the successor hired only nine of 53 people employed by the predecessor. "Clearly, *Burns* establishes that Howard Johnson had the right not to hire any of the former . . . employees, if it so desired." *Id.* at 262.

Therefore, the issue the Court must decide is "which type of successor, *Wiley*, *Burns*, or *Howard Johnson*, is [RAH] most like?" *AmeriSteel* at 286 (Becker, C.J., dissenting). The Court finds that RAH is most similar to the successor in *Howard Johnson*. As in *Howard Johnson*, Midwest did not completely disappear after it was acquired by RAH. Indeed, Midwest is still a separate corporation, and of course the second aspect of this motion seeks to compel Midwest to arbitrate under the Midwest/ALPA CBA. The "successorship" provision contained therein demonstrates the existence of a remedy against Midwest for

failing to expressly bind RAH to the CBA. "The availability of such contractual protections strongly suggests that labor unions have the ability through bargaining to protect their interests against changes in the employer." *Meridian*, 583 F.3d at 85 (Livingston, J., dissenting). This distinction serves to highlight a basic point completely overlooked by the plaintiffs: *Wiley* only applies upon the "*disappearance* by merger of a corporate employer." *Wiley* at 548 (emphasis added).

Additionally, just like the successor employer in *Howard Johnson* who hired only a small number of its predecessor's employees, RAH only hired a small number of Midwest pilots, so there was no "substantial continuity of identity in the work force hired by [RAH] with that of [Midwest]." *Howard Johnson* at 264. While the decision to furlough the Midwest pilots did not happen immediately after RAH acquired Midwest, this is only because Midwest continued to operate as a separate airline. After Midwest stopped flying, it was up to RAH to decide which pilots (if any) it wanted to hire. The "primary purpose" of the IBT in seeking arbitration is not to protect the rights of RAH's employees, but rather to protect the pilots who were not hired by RAH through its operating subsidiaries. This is "completely at odds with the basic principles this Court elaborated in *Burns*. We found there that nothing in the federal labor laws 'requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor . . .'" *Howard Johnson* at 261 (quoting *Burns* at 280 n.5).

The Court acknowledges that the general policy of federal labor law favors the arbitration of grievances. But whether RAH actually agreed to arbitrate in the first place is

-11-

an issue for this Court to decide. *United Steel Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535-36 (7th Cir. 2008). "While we must respect the vital role that arbitration plays in settling labor disputes (and the correspondingly broad authority granted to arbitrators), we think it goes without saying that courts should not compel parties to submit to arbitration when there is nothing to arbitrate. . . . [S]uch an award would be illegitimate because it would 'simply reflect the arbitrator's own notions of industrial justice' and would not 'draw its essence from the contract' itself." *AmeriSteel* at 276-77 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). A party that is not bound by the substantive terms of the CBA "cannot be compelled to submit to arbitration because no arbitration award to the Union could receive judicial sanction." *Id.* at 277.

### B. Motion to compel Midwest to arbitrate

Under the RLA, "minor disputes" are referred to an "appropriate adjustment board," established by the carrier and its employees, acting through their certified representatives. 45 U.S.C. § 184 (Section 204). Minor disputes are disputes "over the meaning of a collective bargaining agreement governed by the [RLA]." *Int'l Bhd. of Teamsters v. Frontier Airlines, Inc.*, 628 F.3d 402, 404 (7th Cir. 2010). A minor dispute "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. . . . [T]he claim is to rights accrued, not merely to have new ones created for the future." *Consol. Rail Corp. (Conrail) v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 303 (1989) (quoting *Elgin , J. & E. Ry. Co. v.*

-12-

*Burley*, 325 U.S. 711, 723 (1945)).[3] The duty to create adjustment boards for the resolution of minor disputes is consonant with the RLA's purpose to prevent "interruptions of service on these vital organs of interstate commerce." *Int'l Bhd. of Teamsters v. Tex. Int'l Airlines, Inc.*, 717 F.2d 157, 158 (5th Cir. 1983) (citing *Burley*, 325 U.S. at 726). This duty is "more than a causal suggestion to the air industry." *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 686 (1963).

Midwest argues that it should not be forced to submit to arbitration before the adjustment board because the plaintiffs' grievances were filed after Midwest ceased operations as an air carrier. There is nothing in the RLA which requires that a grievance must arise or be filed while the employer is actually operating as an air carrier for a grievance to be arbitrable. The duty imposed by the RLA to establish a system board of adjustment is "for the purpose of adjusting and deciding disputes arising under *existing contracts*." *Cent. Airlines*, 372 U.S. at 686 (emphasis added). Midwest's duty to arbitrate did not disappear when it ceased being an air carrier. The continuing obligation to arbitrate grievances finds its source in the underlying CBA. That being said, for jurisdictional purposes, this matter still arises under the Railway Labor Act. 28 U.S.C. § 1331; 28 U.S.C. § 1337(a) ("The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . ."). The duty to arbitrate before the

---

[3] "Major disputes," on the other hand, involve "the formation and amendment of the contract between the employer and the labor union." *Ass'n of Flight Attendants, AFL-CIO v. USAIR, Inc.*, 960 F.2d 345, 348 (3d Cir. 1992); 45 U.S.C. §§ 156, 181. Major disputes are subject to the "purposely long and drawn out" resolution process under the RLA. *Ass'n of Flight Attendants, AFL-CIO v. USAir, Inc.*, 24 F.3d 1432, 1436 (D.C. Cir. 1994); 45 U.S.C. §§ 152, 155, 156. The RLA also governs representation disputes, which are committed to the exclusive jurisdiction of the National Mediation Board. 45 U.S.C. § 152, Ninth.

Midwest/ALPA System Board of Adjustment was undeniably created when Midwest was an air carrier subject to the RLA. A contract formed pursuant to the RLA "is a federal contract and is therefore governed and enforceable by federal law, in the federal courts." *Cent. Airlines* at 692.

In its attempt to avoid arbitration, Midwest cites *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 923 F.2d 678 (9th Cir. 1991), *opinion withdrawn by Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 966 F.2d 457 (9th Cir. 1992). In *Pan Am. World*, the court denied a motion to compel arbitration over the use of flight attendants on foreign flights. Since the RLA "does not apply to purely foreign flying, no substantial question of federal law appears to be raised by an action to enforce an arbitration agreement with respect to such flying." 923 F.2d at 684. *Pan Am. World* is distinguishable because the decision to deny access to foreign flights was never actually subject to the requirements of the RLA. In other words, the RLA and its procedures were inapplicable *ex ante*, whereas in the instant case, the RLA applied from the outset. If an air carrier could avoid its Section 204 duties simply by grounding all of its planes, this would undermine the "stated purposes" of the RLA, which are, among others: "'To avoid any interruption to commerce or to the operation of any carrier engaged therein' and 'to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" *Cent. Airlines* at 689 (quoting 45 U.S.C. § 151a). Therefore, the plaintiffs' grievances do not "extend beyond the scope" of the RLA's "statutory mandate." *Pan Am. World* at 683. The

-14-

"substantial question arising under federal law" is whether "'the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes.'" *Id.* (quoting *Central Airlines* at 691).

As a general rule, "grievances arising before expiration of a CBA survive and continue to be governed by its terms." *Ass'n of Flight Attendants v. Delta Air Lines, Inc.*, 879 F.2d 906, 910 (D.C. Cir. 1989) (citing *Burley, supra*, and *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243 (1977)). Even if it could be said that the CBA expired – Midwest provides no evidence that it did – a dispute is subject to arbitration "even in the postcontract period" if it arises under the contract. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991) (emphasis added). The plaintiffs' grievances as they apply to Midwest all arise under the Midwest/ALPA CBA because they seek to enforce the contractual rights contained therein. These grievances are minor disputes that must be submitted to the Midwest-ALPA System Adjustment Board. Since RAH cannot be bound by the arbitration proceedings, it appears that the plaintiffs would only be entitled to an "award of damages for a past breach of contract," not specific performance under the scope and successorship clauses in the CBA. *Delta Air Lines*, 879 F.2d at 913.

## III. CONCLUSION

Midwest can be compelled to arbitrate grievances under the Midwest/ALPA CBA, but RAH cannot. Therefore, plaintiffs' motion for summary judgment [D. 12] is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion.

Dated at Milwaukee, Wisconsin, this 10th day of November, 2011.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**